FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

METZLER INVESTMENT GMBH,
              *Plaintiff-Appellant,*

and

CONWAY INVESTMENT CLUB,
individually and on behalf of all
others similarly situated,
              *Plaintiff,*

v.

CORINTHIAN COLLEGES, INC.; DAVID
MOORE; ANTHONY DIGIOVANNI;
DENNIS BEAL,
              *Defendants-Appellees.*

No. 06-55826

D.C. No.
CV-04-05025-R

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 11, 2008—Pasadena, California

Filed July 25, 2008
Amended August 26, 2008

Before: Alfred T. Goodwin, Betty B. Fletcher, and
N. Randy Smith, Circuit Judges.

Opinion by Judge B. Fletcher

11671

**COUNSEL**

Jeff S. Westerman, Arthur Miller (argued), Milberg Weiss Bershad & Schulman LLP, Los Angeles, California, for the plaintiff-appellant.

John W. Spiegel, Munger, Tolles & Olson LLP, Los Angeles, California, for the defendants-appellees.

---

## ORDER

We hereby amend our Opinion filed July 25, 2008 at Slip Opinion 9249. We file the Amended Opinion contemporaneously with this order. We amend as follows:

Delete the paragraph on page 9282 beginning "Second, Corinthian . . ." and ending with "regulatory scrutiny."

Insert a new paragraph reading:

"Second, Corinthian was not required to make an immediate disclosure of the DOE and California AG investigations, at least not on the facts of this case. A comparison to *In re Apollo Group, Inc. Securities Litigation*, 509 F. Supp. 2d 837, 841 (D. Ariz. 2007), is instructive. In *Apollo* the district court denied the parties' cross-motions for summary judgment based in part on a disputed fact regarding the materiality of a DOE investigation of the Apollo Group. *Id.* Like Corinthian, Apollo is a large for-profit provider of post-secondary education. *Id.* at 839. The plaintiffs based their claim on the fact that Apollo failed to reveal a DOE investigation of misconduct that tied recruiters' compensation to enrollment figures. *Id.* Defendants failed to disclose a report containing a preliminary DOE finding of non-compliance related to those practices. *Id.* ("The report, which was issued on February 5, 2004, concluded, among other things, that the [Apollo campus at issue] improperly compensated its enrollment counselors 'solely based on [the] recruiters' success in securing enrollments,' a violation of DOE regulations.") (second alteration in

original). Two weeks after the DOE issued that report, Apollo released a press statement regarding a dismissal in related lawsuits based on allegations of recruiter misconduct and that "the government declined to intervene" in those suits. *Id.* at 841-42. Although this statement was formally true, the court found a disputed issue of fact as to whether it was "misleading" in light of the DOE report concerning the exact same recruiting practices.[14] *Id.* at 842; *see also In re Apollo Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005) (denying motion to dismiss in same case where CEO misleadingly suggested that no report would issue from DOE). Here, unlike the complaint in *Apollo*, the TAC does not connect the DOE or California Attorney General investigations to any false or misleading statement— *i.e.*, some affirmative statement or omission by Corinthian that suggested it was *not* under any regulatory scrutiny."

## OPINION

B. FLETCHER, Circuit Judge:

Due in large part to the enactment of the Private Securities Litigation Reform Act ("PSLRA") of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995), plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6). Plaintiff Metzler Investment GMBH's ("Metzler") Consolidated Third Amended Complaint ("TAC"), despite its lengthy and far-ranging allegations, fails to meet these

---

[14]In a settlement agreement that contained no admission of wrongdoing, Apollo agreed to pay $9.8 million to settle the DOE's program review. *In re Apollo Group Inc.*, 509 F. Supp. 2d. at 839-40."

requirements. We affirm the district court's dismissal of the TAC, with prejudice.

## I.  FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

Metzler, an institutional investor, is lead plaintiff in a putative federal securities fraud class action brought pursuant to §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5. Defendant-Appellee Corinthian Colleges, Inc. ("Corinthian") is one of the nation's largest operators of private for-profit vocational colleges. As of June 30, 2004, Corinthian operated 88 such colleges in 22 states. Three individuals who served as officers of Corinthian during the Class Period are also named as Defendants: Dennis Beal, Corinthian's Chief Financial Officer and Vice President; David Moore, Corinthian's Chairman and Chief Executive Officer; and Anthony Digiovanni, Corinthian's President and Chief Operating Officer.

During the Class Period, which extended from August 27, 2003 to July 30, 2004, Metzler purchased 116,000 shares of Corinthian stock. Numerous other plaintiffs also purchased stock during the Class Period and filed their own actions against Corinthian. Eleven separate actions were consolidated with this proceeding and Metzler was appointed lead plaintiff.

### A.  The TAC's allegations of fraud and falsity.

Metzler alleges that Corinthian's colleges are pervaded by fraudulent practices designed to maximize the amount of fed-

---

[1]Our factual summary is taken from the TAC, documents incorporated into the TAC by reference, and matters that were properly judicially noticed by the district court. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007). For purposes of our review, we accept as true all factual allegations in the TAC. *See id.*; *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999).

eral Title IV funding—a major source[2] of Corinthian's revenue—that those schools receive. The TAC alleges that Corinthian engaged in a variety of false or deceptive schemes: falsifying financial aid applications to obtain federal funds and increase federal award entitlements; encouraging students to falsify federal student aid forms themselves; manipulating student enrollment by counting students not yet enrolled (referred to in the TAC as "false starts"); manipulating or falsifying student grades to maintain federal funding eligibility; exposing the company to bad debt in order to meet regulatory requirements for continued federal funding; delaying notification to federal officials of dropped students and delaying refunds to the federal government after students had dropped; and manipulating job placement data in order to satisfy federal and state regulatory requirements. According to the TAC, the net effect of these practices was that "at numerous Corinthian campuses, as many as 50% to 60% of the people defendants represented to the U.S. government as being qualified, attending 'students' were either 'no shows' in class or unqualified for admission and federal funds from the outset." TAC ¶ 4. Thus, according to the TAC, Corinthian's public face to the market—one of growth and financial success premised on increasing student enrollment and successful placement rates —masked extensive fraud. The TAC alleges that this fraud resulted in an artificial inflation of Corinthian's stock price.

The TAC further alleges that Corinthian violated Generally Accepted Accounting Principles ("GAAP") by improperly recognizing revenue. According to the TAC, at some of its schools Corinthian recognized an entire month's worth of tuition revenue for a student's first full month of attendance, regardless of the date during that month on which the student started. Corinthian ultimately changed this practice to recognize tuition for half of a student's first month of attendance and half of a student's final month of attendance. As a result,

---

[2]In 2003, Corinthian derived 82% of its revenue from federal student loan funding.

in August 2005, it issued restated financials that reflected a $16.9 million decrease in retained earnings.

These allegations of fraudulent practices are supported principally by statements taken from confidential witnesses (abbreviated in the TAC as "CW"), who are former Corinthian employees that served at numerous campuses in differing capacities. The CW's identified in the TAC include campus presidents, admissions officials, financial aid officers, and IT and accounting personnel. These CW's, with varying degrees of specificity, attest to instances of misconduct on their campuses that support the more generalized allegations of fraud contained elsewhere in the TAC.

The TAC also avers to post-Class Period events that serve to confirm the TAC's allegations of Corinthian's fraud during the Class Period. In November 2005, Corinthian released restated financials that revealed Corinthian had overstated its revenues during the Class Period. The restatement revealed that revenues were overstated by 10.5% for the quarter ending September 30, 2003, 4.5% for the quarter ending December 21, 2003, and 15% for the quarter ending March 31, 2004. The TAC points to government investigations and private litigation, initiated after the close of the Class Period, that further confirm Corinthian's fraudulent practices. In November 2005, the Florida Attorney General subpoenaed documents from a Corinthian campus in Florida related to Corinthian's advertising and admissions practices. In December 2005, three Corinthian campuses in Georgia had their accreditation revoked by the Accrediting Bureau of Health Education Schools ("ABHES") for failing to meet student completion and placement requirements. Similarly, Corinthian colleges in Michigan and Indiana were ordered by the ABHES to show cause why, because of alleged improper admissions and high attrition, they should not have their accreditation revoked.

Because Corinthian campuses were allegedly pervaded by fraudulent admission practices, the TAC alleges that virtually

every Class Period statement discussing Corinthian's financial status was false. Specifically, the TAC alleges that public statements in regulatory disclosures and related documents regarding the company's financial performance were rendered false by the fact that Corinthian's underlying fraudulent practices remained hidden. The TAC states:

> All of Corinthian's stated financial results during the entire Class Period were false and misleading as a result of the Company-wide scheme to inflate enrollment figures in order to misappropriate federal financial aid funding. Likewise, defendants' statements lauding the Company's strong financial performance were also false and misleading. . . . Defendants also made positive statements regarding the Company's educational services and business practices that were false and misleading in light of the fraudulent means by which a substantial portion of the Company's business was gained, in complete disregard for their students' educational goals and financial well-being. . . . The totality of defendants' statements underlined above create the false impression that defendants ran their business with proper financial reporting compliance with student enrollment and federal loan practices which were critical to the viability of the business, and that quality of education was emphasized.

TAC ¶¶ 142-150. The TAC thus alleges that any positive financial statement released by the company created the decidedly false impression among investors that Corinthian's success was due to "legitimate business means that could be expected to continue," when in fact its "financial performance was materially driven by fraudulent manipulation of the Title IV funding program and could cease at any time if exposed." TAC ¶ 147(a).

In addition to these alleged affirmative false statements, the TAC also claims that Corinthian made "omissions to conceal [its] regulatory and accounting problems," by failing to immediately disclose a Department of Education ("DOE") investigation at Corinthian's Bryman College campus in San Jose, California ("Bryman"). TAC ¶ 322. The DOE investigation, commenced in December 2003, concluded that admission officials at Bryman failed to properly verify student information submitted in connection with financial aid applications, and resolved inconsistencies in those applications in a manner favorable to Bryman's ability to obtain federal funding. As a result of the DOE investigation, the Bryman campus was placed on "reimbursement" status; reimbursement status requires an institution to seek reimbursement for federal funding as opposed to having those funds dispersed up front. The lag time between application and reimbursement may be as long as 45 days. Corinthian did not disclose this investigation or its findings in its fourth quarter 2003 or first quarter 2004 SEC filings. Instead, on June 24, 2004, a *Financial Times* news article reported on the investigation, stating that, "Inspectors discovered that school officials had helped students manipulate financial aid documents to obtain the maximum possible towards tuition fees — breaching Title IV of the Higher Education Act. They found admission officers assisted students in claiming extra dependants to obtain additional financial aid, according to the legal sources."[3] Corinthian responded with a press release the same day, confirming the investigation and stating that DOE's primary finding was that "the school had not properly verified information in students' financial aid applications." The following day, on June 25, 2004, a DOE official was quoted in a *Financial Times* article

---

[3]The Bryman campus was notified by the DOE that it had been returned to standard advance payment status on September 22, 2004. A Corinthian press release explained, "The notification from the DOE stated that the change in status was based, in part, on the school's ability to demonstrate that it can comply with the rules and regulations of the Federal Title IV programs."

as stating that the investigation "did not confirm or deny anything about fraud."

Similarly, the TAC alleges that Corinthian improperly withheld information related to an investigation by the California Attorney General. The California Attorney General had met with Corinthian officials on July 21, 2004, in order for Corinthian to voluntarily provide information related to its admission practices and student satisfaction. Again, Corinthian did not immediately disclose this meeting or its purpose. Instead, a press release issued on August 2, 2004, which also included an adjusted revenue forecast, disclosed the fact of the meeting and Corinthian's voluntary compliance with the California Attorney General's requests.

## B.    The TAC's scienter allegations.

The TAC states that "defendants acted with scienter," which requires an intent to defraud or deceive, as to their alleged fraudulent practices and false public statements. TAC ¶ 348. The TAC relies on a variety of allegations to support its claim that Corinthian's practices were intended to deceive investors.

First, the TAC alleges that suspicious stock sales made by Beal and Moore during the Class Period reflect the fact that Corinthian's purported fraudulent practices were intentional. During the Class Period, Beal and Moore sold over $33 million in stock. These Class Period sales constituted approximately 37% of Moore's total holdings and 100% of Beal's holdings. The proceeds from those sales were substantially higher than the proceeds each received from pre-Class Period sales (82% higher for Moore; 252% higher for Beal). Neither Beal nor Moore made any sales after the June 24, 2004 *Financial Times* story revealing the investigation at the Bryman campus.

Second, the TAC points to Corinthian's "hands on" management and tracking of student data and information. TAC

¶ 369. According to a 2003 Form 10-K, Corinthian's senior management exercised close oversight over school performance and "monitor[ed] operating performance and profitability of each college and ha[d] access to operational data through our sophisticated information systems . . . [including] lead flow, starts, student population, and other operating results to determine the proper course of action." TAC ¶ 367 (quoting Corinthian's 2003 Form 10-K). Several confidential witnesses corroborated the fact that Corinthian management closely monitored performance at each campus, including information regarding student enrollment and retention. This information was also contained in a "sophisticated information management system and database [Corinthian] employed to track everything from student recruitment to job placement." TAC ¶ 371. The inference plaintiffs draw from the availability of such a wide swath of data is that Corinthian's management must have known about underlying fraudulent conduct to achieve maximum federal funding at various schools.

Third, the TAC avers to Beal's knowledge of Corinthian's early revenue recognition practices—crediting a full month's worth of tuition regardless of whether a student started at the beginning or end of that particular month—as reflective of knowledge of fraudulent conduct more generally. The TAC also alleges that at a company-wide meeting in Spring 2004, Beal complained to Corinthian corporate officers and campus officials that the company's numbers needed to improve, and that admissions officers work in "the gray area" when dealing with unqualified students. TAC ¶ 297. Beal also resisted changes to Corinthian's revenue recognition practices because he was reluctant to take the one quarter "hit" that would result from changing the practice; an end of month revenue recognition would result in a loss to reported revenues for earlier in the month. TAC ¶ 130. When other Corinthian officers raised concerns regarding the practices, Beal allegedly dismissed those concerns as unimportant or insignificant. Again, this

revenue recognition practice was ultimately changed in August 2005 after the close of the Class Period.

More generally, the TAC refers to post-Class Period statements that confirm that Corinthian was aware of wrongdoing during the Class Period. The TAC contends that a slide show given at Corinthian's 2005 Presidents' meeting demonstrates that it knew compliance problems were detrimental to the company's well-being. Those slides stated that "failure to adhere to program requirements impacts students [sic] skill development and may lead to student injury, lack of certification, poor patient care, [and] other end-customer impact." TAC ¶ 62. The presentation slides also referred to the significance of Corinthian's regulatory compliance obligations, observing: "As a publicly traded company, we must disclose violations of regulatory non-compliance: Increases administrative burden on the corporation to respond and defend; Impacts public confidence, stock price; Even non-material violations, if detected, are highly scrutinized by investors." TAC ¶ 141.

## C.   The TAC's allegations that Corinthian's fraud was revealed to the market, causing Metzler's losses.

The TAC points to two specific disclosures that purportedly revealed Corinthian's fraudulent student enrollment and financial aid practices to the market: (1) the June 24, 2004 *Financial Times* story reporting the DOE investigation at the Bryman campus, and (2) an August 2, 2004 press release disclosing reduced earnings and earning projections. According to the TAC, when read in tandem these two disclosures revealed "the truth regarding [Corinthian's] fraudulent practices and deception," and precipitated considerable drops in the value of Corinthian stock. TAC at 18.

As described above, the June 24 *Financial Times* story revealed that the DOE investigated Corinthian's Bryman campus in December 2003, and as a result that campus had been

placed on reimbursement status. The *Financial Times* story further reported, however, that the DOE review and Bryman's placement on reimbursement status, "does not affect the status of other Corinthian schools." Nonetheless, Corinthian stock fell $2.55 on June 24, losing 10% of its value and closing at $22.51. Corinthian's stock rebounded within three trading days and by June 29, 2004, it rose to $25.11, an amount that exceeded the stock's value before the June 24 *Financial Times* story.

The second alleged disclosure occurred on August 2, 2004, when Corinthian issued a press release announcing that it had cut its revenue and earnings projections for the fourth quarter of 2004 and all of fiscal year 2005. That press release also revealed that the company had participated in a meeting with the California Attorney General regarding Corinthian's business practices. The release announced revised earnings per share ("EPS") for fiscal year 2004 of 86 to 87 cents, down from earlier projections of 94 cents EPS. The company also lowered guidance for all of fiscal year 2005. CEO Moore attributed the reduced earnings and accompanying projections to a number of factors:

> During the fourth quarter [FY 2004] we achieved a remarkable growth rate in student enrollments, although below our expectations. Strong growth, unfortunately, sometimes brings challenges, and there were several during the past quarter that we now believe caused our revenue to fall short of our expectations and earlier guidance. Those factors included changes in lead flow mix among television leads, direct mail leads, newspaper leads and Internet leads; higher than anticipated attrition; negative publicity related to student litigation in Florida; and later than anticipated new branch campus openings.

After the August 2, 2004 earnings miss, Corinthian's stock dropped 45% to $10.29.

The TAC focuses on a particular passage from the August 2 release: Moore's reference to "higher than anticipated attrition" at Corinthian schools. The TAC contends that this language is a veiled reference alerting the market to Corinthian's more extensive fraudulent student enrollment and financial aid practices:

> Plaintiff and the Class members purchased Corinthian shares during the Class Period at artificially inflated prices without knowledge of defendants' fraudulent financial aid and related practices . . . . [A]rtificial inflation in Corinthian's stock price was eliminated on August 2, 2004, when defendants announced the lowered financial results and—for the first time—partially attributed the revenue shortfall to "higher than anticipated attrition"—a euphemism for an admission that they had enrolled students who should not have been signed up at all, resulting in a 45% stock drop. This precipitous drop in share value is consistent with plaintiff's allegation that as much as 50% to 60% of enrollment at some Corinthian schools were illegitimate "false starts."

TAC ¶¶ 48-49. Although the TAC contends that the August 2 press release's reference to attrition alerted the market to inflated student enrollment numbers, that same release reported that Corinthian's overall enrollment had increased 49.9% for fiscal year 2004. The TAC does not dispute that there was an increase in overall reported enrollment in 2004, nor does it point to information—beyond the *Financial Times* story and the August 2 press release—that informed the market that Corinthian had engaged in widespread student enrollment and financial aid fraud. But the TAC avers that the cumulative effect of these two disclosures was to peel back the curtain and reveal Corinthian's "impaired and falsely presented financial condition," leading to the considerable stock drop that caused Plaintiffs' claimed damage. TAC ¶ 50.

### D.   The district court's dismissal of the TAC.

Plaintiffs, with Metzler acting as lead plaintiff, filed the Consolidated Amended Complaint ("CAC") on February 17, 2005. The Defendants moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6); on September 6, 2005, the district court dismissed the CAC without prejudice and granted leave to amend. No written order accompanied the dismissal of the CAC. A Second Consolidated Amended Complaint was filed on October 3, 2005. Again, the Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6), and again that complaint was dismissed without prejudice via a minute order issued without comment or analysis.

On February 6, 2006, the TAC was filed; Defendants followed course and moved to dismiss. After argument by counsel on Defendants' motion at an April 24, 2006 hearing, the district court dismissed the TAC, this time with prejudice. The district court offered no reasons for the dismissal at that hearing, other than to comment, "I don't think you have been able to find anything that goes to the real core of what you allege, and the motion [to dismiss] is granted this time with prejudice." The Defendants prepared a written dismissal order at the district court's request. Defendants' four-page prepared order recounted the various arguments presented in favor of dismissal and concluded: "Defendants' arguments are well-taken and their motion to dismiss is granted. Plaintiff has failed to allege an actionable securities claim." The prepared order was signed, unaltered, by the district court on May 1, 2006.[4]

This timely appeal followed.

---

[4]The dismissal with prejudice was, according to the prepared dismissal order, based on Metzler's "multiple opportunities to amend and [being] unable to cure the defects that required dismissal of [ ] previous complaints."

## II.  STANDARD OF REVIEW

The court reviews dismissal under Rule 12(b)(6) *de novo*. *See Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court "accept[s] the plaintiffs' allegations as true and construe[s] them in the light most favorable to plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). Review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice. *Tellabs*, 127 S. Ct. at 2509.

The required elements of a private securities fraud action are: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)).

As a putative securities fraud class action, the TAC is also subject to the pleading requirements of the PSLRA. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002). In order to state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a "strong inference" of scienter—*i.e.*, a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). In reviewing a complaint under this standard, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897 (emphasis in original); *accord Tellabs*, 127 S. Ct. at 2509 ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."). This examination requires the court to survey the complaint in its entirety, not to simply

scrutinize individual allegations in isolation. *See Tellabs*, 127 S. Ct. at 2509 (citing *Gompper*, 298 F.3d at 897).

The PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). By requiring specificity, § 78u-4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002).

The district court did not attempt to explain why the TAC or the prior complaints were subject to dismissal.[5] Based on

---

[5]The prepared four-page dismissal order signed by the district court provides no meaningful guidance as to why the TAC—181 pages comprised of 399 paragraphs—was deficient. Fortunately, the parties' briefing below and on appeal accurately identifies and thoroughly analyzes the disputed issues. But good lawyering is not a substitute for clear judging.

Dismissal of securities fraud complaints by way of a boilerplate prepared order effectively requires the appeals court to decide the 12(b)(6) motion without any explanation from the district court as to the complaint's defects. Moreover, the parties themselves never receive the benefit of learning the district court's reason or reasons—whatever they may be— for the dismissal. Although there is no absolute rule requiring a district court to issue a written dismissal for failure to state a claim, the preferred practice is to provide at least some modest explanation for the decision. *See Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962) ("Where a complaint is dismissed on the ground that it fails to state a claim, the order should also inform the plaintiff of the reason for dismissal so that he can make an intelligent choice as to amending."). A review of published and unpublished decisions in recent securities fraud cases confirms that the truncated manner of dismissal here is the exception that proves the rule, as other district courts appear to routinely issue well-articulated dismissal orders. *See, e.g., In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d

the thorough dismissal briefing below and the arguments raised on appeal, however, we are able to accurately identify the three contested grounds for dismissal: (1) failure to plead "loss causation," (2) failure to raise a "strong inference" of scienter, and (3) failure to allege "falsity" with the specificity required by the PSLRA. We agree that the TAC fails on all three bases.

## III.    DISCUSSION

### A.    The TAC does not adequately plead "loss causation."

[1] As explained by the Supreme Court in *Dura Pharmaceuticals*, loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." 544 U.S. at 342 (citation omitted). A complaint fails to allege loss causation if it does not "provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]" *Id.* at 347. Stated in the affirmative, the complaint must allege that the defendant's "share price fell significantly after the truth became known." *Id.* A plaintiff does not, of course, need to *prove* loss causation in order to avoid dismissal; but the plaintiff must properly allege it. *Id.* at 346 ("[N]either the Rules nor the securities statutes impose any special further requirement [beyond Fed. R. Civ. P.

---

1033 (N.D. Cal. 2007); *In re Gilead Scis. Sec. Litig.*, 2006 WL 1320466 (N.D. Cal. May 12, 2006)*; Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1178 (N.D. Cal. 2005).

Based on the extensive record before us, we are nonetheless confident that Metzler was sufficiently well-informed of the deficiencies in the TAC and the prior complaints, and that no harm was suffered as a result of the district court's failure to provide a reasoned explanation for dismissal. But neither the parties, nor the interests of efficient civil justice, were well-served by the district court in this case.

8(a)(2)] in respect to the pleading of proximate causation or economic loss.").

**[2]** The principal Ninth Circuit case applying *Dura*'s loss causation standards is *In re Daou Systems*. 411 F.3d 1006. The *Daou* court explained, "A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation." *Id.* at 1025 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)) (emphasis in original). A plaintiff's complaint must, however, set forth allegations that "if assumed true, are sufficient to provide [the defendant] with some indication that the drop in [defendant's] stock price was causally related to [the defendant's] financial misstatement[s]." *Id.* at 1026; *accord Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008). So, in *Daou* the court held that the plaintiff had pled loss causation based on allegations that major losses reported in an August 1998 quarterly report were causally connected to the company's premature recognition of revenue—the practice that served as the basis of the alleged fraud in the plaintiff's complaint. *Id.* But the court held that the plaintiff had *not* adequately pled loss causation for the drop in the defendant's stock that occurred prior to the August 1998 disclosure, because those losses took place "before the revelations began in August 1998, [when] the true nature of [the defendant's] financial condition had not yet been disclosed." *Id.* at 1027.

**[3]** Thus, the *Daou* court's careful delineation between losses caused after the company's conduct was revealed, and losses suffered before the revelation, confirm that the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses. In *Daou* the plaintiffs' theory of fraud was that the defendant was systematically recognizing revenue on contracts that had not been completed. *Id.* at 1012-13. Plaintiffs adequately pled loss causation in *Daou* because their complaint alleged that the market learned of and reacted to

this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally. *Id.* at 1026 ("[T]he TAC alleges that 'Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables—*the direct result of prematurely recognizing revenue*.") (emphasis in original); *see also Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) (holding that plaintiffs must plead [loss causation] "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists"); *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (holding that to plead loss causation plaintiff had to allege that the defendant's "material misrepresentation [ ] caused [the plaintiff] to suffer a loss when that material misrepresentation 'became generally known' ").

**[4]** Here, Metzler relies on the June 24 *Financial Times* story disclosing the DOE investigation at the Bryman campus and the August 2 earnings announcement. In doing so, Metzler fails to adequately plead loss causation.[6] The TAC does not allege that the June 24 and August 2 announcements disclosed—or even suggested—to the market that Corinthian was manipulating student enrollment figures company-wide in order to procure excess federal funding, which is the fraudulent activity that Metzler contends forced down the stock that caused its losses. Neither the June 24 *Financial Times* story nor the August 2 press release regarding earnings can be reasonably read to reveal widespread financial aid manipulation by Corinthian, and the TAC does not otherwise adequately plead that these releases did so.

---

[6]Despite Corinthian's arguments to the contrary, there is no prohibition against Metzler alleging loss causation through a series of disclosures by the Defendants. *Daou*, 411 F.3d at 1026. So, the TAC's allegations of loss causation premised on two separate disclosures—one on June 24 and one on August 2—are, in theory, a permissible means for alleging loss causation.

As for the *Financial Times* story, it does reveal a DOE investigation at the Bryman campus and the campus's placement on reimbursement status as a result of improper financial aid practices; but it simultaneously notes that the investigation there "does not affect the status of other Corinthian schools." The TAC does not allege that all, or even some appreciable number, of Corinthian's schools were being investigated or placed on reimbursement status. Only the Bryman campus was subject to that sanction. Indeed, the TAC itself discredits the notion that the June 24 disclosure revealed company-wide manipulation of student enrollment, by describing the June 24 disclosure as revealing to investors "the *potential* but real *risk* of all 88 colleges being placed on reimbursement status, which would have delayed Title IV funding and increased accounts receivable by up to $135 million company-wide." TAC ¶ 159 (emphases added). But neither *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's disclosure reveals a "risk" or "potential" for widespread fraudulent conduct. In *Daou* the defendant disclosed that the company actually had $10 million in unbilled receivables, not merely that there was some risk it might accrue such receivables. 411 F.3d at 1026. Moreover, as Corinthian notes, its stock recovered very shortly after the modest 10% drop that accompanied the June 24 announcement.[7]

The TAC's characterization of the August 2 earnings announcement similarly fails to allege that the market became aware of, and the resulting stock drop resulted from, widespread enrollment fraud. At best, the TAC contends that the reference in the August 2 announcement to "higher than antic-

[7]Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject to judicial notice).

ipated attrition" was understood by the market as Corinthian's "euphemism for an admission that they had enrolled students who should not have been signed up at all, resulting in a 45% stock drop." TAC ¶ 48. Metzler's appellate brief asserts that the August 2 disclosure made investors "realize[ ] that Corinthian's improper manipulation of student and enrollment records was not limited to [the Bryman campus at] San Jose, nor was it immaterial." But the TAC does not allege facts to suggest that on August 2 the market became aware that Corinthian was manipulating student records company-wide, other than an undocumented assertion that Corinthian's August 2 stock drop was, by necessity, a result of this market "realization."[8]

Metzler is correct to observe that neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled. *Dura Pharms., Inc.*, 544 U.S. at 346; *Daou*, 411 F.3d at 1025. But that does not allow a plaintiff to plead loss causation through "euphemism" and thereby avoid alleging the necessary connection between defendant's fraud and the actual loss. So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market "understood" a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price. 544 U.S. at 347. Loss causation requires more. *Daou*, 411

---

[8]Nor do the June 24 and August 2 disclosures become adequate when viewed in tandem. The June 24 *Financial Times* story discusses impropriety regarding the financial aid practices at one school; the August 2 release contains one reference to attrition. The combined force of these statements does not suggest that the market was alerted to widespread enrollment and admissions fraud at Corinthian schools nationwide. Nor does the TAC allege any genuine causal connection between the August 2 earnings miss and the allegations that Corinthian had manipulated student enrollment in order to receive excess federal funds, or that the earnings miss was caused by slashed federal funding.

F.3d at 1026 (plaintiff's complaint quoting an analyst as inter-preting defendant's unbilled receivables as suggesting "they are manufacturing earnings").

[5] Finally, while the court assumes that the facts in a com-plaint are true, it is not required to indulge unwarranted infer-ences in order to save a complaint from dismissal. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) ("[C]onclusory allegations of law and *unwarranted inferences* are insufficient to defeat a motion to dismiss for failure to state a claim.") (emphasis added) (affirming 12(b)(6) dis-missal of securities fraud complaint). The TAC's allegation that the market understood the June 24 and August 2 disclo-sures as a revelation of Corinthian's systematic manipulation of student enrollment is not a "fact." It is an inference that Metzler believes is warranted from the facts that are alleged. But Corinthian persuasively explains why this is not the case. As to the June 24 disclosure, Corinthian points out that its stock quickly recovered from the 10% drop that followed the *Financial Times* story. Similarly, the August 2 announcement contained a far more plausible reason for the resulting drop in Corinthian's stock price—the company failed to hit prior earnings estimates. The August 2 announcement simulta-neously reported that student population growth was up nearly 50% overall and same-school population increased 15%, mak-ing it even further unwarranted to infer that the reference to "attrition" was understood by the market to mean that Corin-thian had revealed widespread misrepresentation of student enrollment to fraudulently procure excess federal funding. The TAC thus fails to allege loss causation based on the June 24 and August 2 disclosures.[9]

---

[9]Corinthian also argues that Metzler cannot, as a matter of law, establish loss causation because the TAC describes post-Class Period events that indicate that the purported fraud continued beyond the Class Period. Rely-ing on the Seventh Circuit's decision in *Thomas v. Farley*, 31 F.3d 557 (7th Cir. 1994), Corinthian argues that the allegations of post-Class Period misconduct are fatally inconsistent with the theory that Corinthian's mis-

### B.   The TAC does not raise a "strong inference" of scienter.

**[6]** In order to state a claim for securities fraud, a plaintiff must allege that defendant acted with scienter—that the defendant had an intention "to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193. "[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but

---

conduct was revealed through the June 24 and August 2 disclosures. This argument is not supported by the record or the law.

The post-Class Period conduct and statements in the TAC do not aver that Corinthian continued to conceal its alleged unlawful enrollment practices after the close of the Class Period. Rather, nearly all of these references in the TAC concern Corinthian's restatement of revenue that took place later in 2005, an occurrence that does not inexorably lead to the conclusion that Corinthian was continuing to conceal its student enrollment practices. So, while it is correct that loss causation cannot be alleged by referring to a drop in a stock price that occurs prior to the revelation of the alleged truth, *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 479 (4th Cir. 2006), Corinthian has not persuasively shown that is what the TAC's references to post-Class Period conduct does.

Moreover, the Seventh Circuit's holding in *Thomas* that a plaintiff can plead "himself out of court" by alleging particulars that contradict the plaintiff's legal theory is not applicable in this case. 31 F.3d at 559. *Thomas* is applied in this circuit as support for the rule that precludes a party from avoiding summary judgment by making statements that contradict earlier allegations. *See Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1232 (9th Cir. 2000) (citing *Thomas* for proposition that "Appellants could not contradict their earlier allegations in an effort to survive summary judgment."). Corinthian points to no authority that prevents a securities fraud plaintiff from alleging that the defendant continues to perpetuate the misconduct after it has been revealed to the market. Although such behavior is no longer "fraud" *per se*—because the misrepresentations have been revealed and reliance is no longer possible—that does not mean that the earlier fraud is somehow legally negated. Hence, the TAC's reference to post-Class Period conduct does not defeat loss causation as a matter of law (although, for reasons discussed above, the TAC also does not otherwise establish loss causation).

rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979. "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotation marks and citation omitted).

**[7]** The PSLRA placed an additional gloss on the scienter requirement so that a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The PSLRA does not further define what is required in order to allege a "strong inference" of scienter. In *Tellabs* the Supreme Court addressed that question, holding that a court evaluating a complaint for compliance with PSLRA's "strong inference" of scienter:

> [M]ust engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

127 S. Ct. at 2504-05. When assessing a complaint for compliance with this standard, "courts must consider the complaint in its entirety . . . [and inquire] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard." *Id.* at 2509 (emphasis in original).[10]

The TAC alleges that scienter is principally established here by three factors: (1) insider trading during the Class Period by Defendants Moore and Beal; (2) the existence of a "sophisticated information management system" within Corinthian that would have enabled management to access "all student and financial aid records for all Corinthian schools," TAC ¶ 371; and (3) Defendant Beal's involvement in Corinthian's revenue recognition policies and his rejection of alternate accounting methods. Metzler's allegations—even when taken collectively—do not give rise to a "strong inference" of scienter sufficient to defeat dismissal.

### 1. The insider trading alleged does not raise a "strong inference" of scienter.

While " 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter," such sales only give rise to an inference of scienter when they are " 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)). Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history. *Id.* During the Class Period, Defendants Moore and Beal sold a total of $33 million

---

[10]The *Tellabs* Court cited with approval this court's decision in *Gompper*, which articulated a standard for evaluating a securities fraud complaint's scienter allegations similar to the standard ultimately adopted by the Court. 127 S. Ct. at 2509 (citing *Gompper*, 298 F.3d at 897 ("the court must consider *all* reasonable inferences to be drawn from the allegations, including references unfavorable to the plaintiffs") (emphasis in original)). We thus rely on the Ninth Circuit's pre-*Tellabs* decisions interpreting the PSLRA's scienter requirement where appropriate here.

of Corinthian stock; the sales constituted 37% of Moore's stock and 100% of Beal's. TAC ¶ 360. Metzler makes repeated reference to the gross profits obtained by these sales to allege scienter, but a more careful look at the transactions tells a different story.

**[8]** Many of the sales alleged to demonstrate scienter took place in October 2003 before the DOE began its investigation at the Bryman campus. There is therefore nothing particularly suspicious about the "timing of [these] sales," even accepting as true Metzler's theory that the DOE Bryman investigation would have triggered a sell-off amongst insiders. *Silicon Graphics*, 183 F.3d at 986 (affirming dismissal where trading consistent with prior practices). Moreover, of the three individual Defendants, only Beal sold large amounts of his total stock holdings during the Class Period—and half of these sales were before the DOE investigation at the Bryman campus. Digiovanni made no sales during the Class Period; Moore sold only 37% of his total stock holdings during the Class Period. We typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter. *Id.* at 987-88 (no inference of scienter with sales of 75.3% of holdings); *see also Tripp v. Indymac Fin., Inc.*, 2007 WL 4591930 at *4-5 (C.D. Cal. Nov. 29, 2007) (dismissing for lack of scienter where several individual defendants sold no stock, and the sales of the sole defendant who sold "were relatively small given his overall holdings"). Moreover, both Moore and Beal sold in a manner consistent with their pre-Class Period sales; they regularly sold as their options vested. So the sales here are largely consistent with the prior trading history. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("Stock trades are only suspicious when 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' ") (quoting *Silicon Graphics*, 183 F.3d at 986).[11] The allegations of insider trading do not raise a "strong

[11]As Defendants note, the bulk of Beal's and Moore's sales took place according to pre-determined 10b5-1 trading plans. Sales according to pre-

inference" of scienter, particularly when considering the possible "opposing inference[s]" to be drawn from the pattern of trading in this case. *Tellabs*, 127 S. Ct. at 2504-05 Namely, Moore and Beal were simply trading in line with prior patterns, and selling without regard to the timing and substance of the DOE investigation at Bryman. Digiovanni meanwhile sold nothing at all, suggesting that there was no insider information from which to benefit. So, when the allegedly improper stock transactions are viewed as a whole, they fail to raise the necessary "strong inference" of scienter required by the PSLRA.

### 2. Corinthian's use of a "management information system" does not raise a "strong inference" of scienter.

The TAC also alleges that because Corinthian had in place a "management information system" that monitored enrollment and other data company-wide, its principals must have had knowledge of the alleged fraudulent practices. TAC ¶ 371. This argument rests on an inference that the existence of Corinthian's complex computer tracking-system mutually excludes the possibility that Beal, Moore and Digiovanni were unaware of massive enrollment fraud. This allegation is further supported by the statements of a confidential witness who alleged that the Defendants, Beal in particular, were regularly made aware of the status of Corinthian's enrollment and placement figures.

[9] Again, the TAC's allegations lack the specifics required to establish a "strong inference" of scienter. As this court has noted on more than one occasion, corporate management's

determined plans may "rebut [ ] an inference of scienter." *Cf. In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994) (sales based on pre-determined trading plan coupled with small sales amounts rebutted allegations of scienter).

general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002) ("[P]laintiffs have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports."); *Silicon Graphics*, 183 F.3d at 988 (allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped"). Viewed under the rubric of the *Tellabs* Court's instruction to comparatively weigh inferences, it is more "cogent and at least as compelling" to conclude that Corinthian maintained its information tracking systems for the necessary and legitimate purpose of running its business. 127 S. Ct. at 2505.[12]

---

[12]Metzler's insufficient scienter allegations are not overcome with references to post-Class Period statements. Metzler places special emphasis on a slide show presented at Corinthian's Presidents' Meeting in 2005 that summarizes a Corinthian 2004 internal audit and refers to several findings regarding Corinthian's "Financial Aid" practices. TAC ¶ 13 ("Unresolved Credit Balances . . . Missing Documents . . . Late Refunds . . . Incorrect DOD's"). Metzler alleges that these slides point to "internal reforms" that raise a "strong inference" of scienter. But plaintiffs fail to allege any corroborating details to indicate that the audit revealed company wide fraud, or that the Defendants were aware of the fraud during the Class Period. Accordingly, these post-Class Period statements do not rectify the lack of scienter pled elsewhere. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941-42 n.20 (9th Cir. 2003) (noting that generalized references to internal reports insufficient to provide strong inference of scienter as to particular defendant).

### 3. Beal's insistence on certain revenue recognition practices do not raise a "strong inference" of scienter.

Relying on the statements of confidential witnesses, the TAC alleges that Beal insisted on perpetuating an improper method of revenue recognition for Corinthian in violation of GAAP. As mentioned, the revenue recognition practice in question involved accounting for a full month of revenue during a student's first month, and spreading revenue recognition for students with externships to include the post-class instruction period. The TAC also alleges that Beal implied to admissions officers at a company-wide meeting that they had the authority to admit unqualified students. TAC ¶ 297 (CW20 testifying that Beal stated admissions officers "are the gray area").

[10] The first of these allegations—going to Corinthian's revenue recognition for certain students—fails to raise a "strong inference" of scienter because the TAC does not sufficiently allege that Beal knowingly and recklessly engaged in an improper accounting practice. The TAC does not allege that Corinthian's external auditors counseled against the practice or that Beal admitted or was aware it was improper. Although the TAC does draw its own legal conclusion that the practice was improper, TAC ¶ 289, the TAC's factual allegations point only to disagreement and questioning within Corinthian about the practice. Finally, the TAC does not tie the disputed revenue recognition practice, or Corinthian's restatements when the practice was changed, to the TAC's more general theory that Corinthian invented the presence of students in order to increase access to federal financial aid. Given the standard for reliance on technical GAAP violations to plead securities fraud, the TAC fails to establish scienter based on these allegations. *Daou*, 411 F.3d at 1022 ("scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP"); *DSAM Global Value Fund*, 288 F.3d at 389 ("To allege a 'strong inference of

deliberate recklessness,' Appellants 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.' ") (quoting *Silicon Graphics*, 183 F.3d at 974) (affirming dismissal due to failure to allege scienter based on GAAP violations).

The TAC's most persuasive allegation of scienter involves Beal's comments to admissions officers at the company's Spring 2004 meeting, purportedly telling admissions officers that "they are the gray area" in dealing with unqualified students. TAC ¶ 297. This is perhaps the closest the TAC comes to an allegation that the named Defendants were aware of or encouraged fraudulent conduct related to Corinthian's admission practices. Viewing the TAC in its totality, however, this statement does not raise a "strong inference" of scienter. Beal's statement is capable of being read in the manner Metzler urges—Beal was instructing admissions to admit unqualified students. But the *Tellabs* Court's directive that a complaint must be read in its entirety cuts both ways. Although a defendant cannot gain dismissal by de-contextualizing every statement in a complaint that goes to scienter, a plaintiff cannot *avoid* dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations. *Tellabs*, 127 S. Ct. at 2509 ("*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (emphasis in original). Beal's "gray area" statement is susceptible to Metzler's characterization that it was intended as a winking suggestion that admissions officers should perpetrate fraud. But it is equally susceptible to an interpretation, not unlikely given its utterance at a company-wide meeting, that Beal was simply making a broader exhortation to improve business. In light of the Court's guidance in *Tellabs* and PSLRA's heightened standards for plaintiffs' securities fraud cases generally, this statement it not so indicative of fraudulent intent that it carries the

weight of the entire 181-page complaint for purposes of establishing a "strong inference" of scienter.[13]

## C.    The TAC does not adequately plead falsity.

[11] The PSLRA has exacting requirements for pleading "falsity." The plaintiff's complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard. *Falkowski*, 309 F.3d at 1133 ("Although the allegations here are voluminous, they do not rise to the level of specificity required under the PSLRA. The allegations consist of vague claims about what statements were false or misleading, how they were false, and why we can infer intent to mislead. We have dismissed much more specific and compelling allegations."). The TAC alleges that Corinthian's fraudulent practices generally along with its failure to make earlier disclosures of regulatory investigations—particularly the DOE investigation at the Bryman campus and the California AG investigation—rendered Corinthian's SEC filings and other public statements made during the Class Period either affirmatively false or false by way of omission.

---

[13]The TAC relies on the statement of CW20, a former Director of Financial Aid at Corinthian's Las Vegas College, who was employed by Corinthian for part of the Class Period and attended the meeting at issue. CW20's identity and knowledge, as with the other confidential witnesses named in the TAC, are described with sufficient specificity to meet the PSLRA's standards generally. *See Daou*, 411 F.3d at 1016 ("Plaintiffs here describe the confidential witnesses with a large degree of specificity."). The problem for Metzler is not that the confidential witnesses are inadequately identified—the problem is that these witnesses do not convey information sufficient to support the strong inference of scienter that the PSLRA requires.

TAC ¶¶ 142-150. These allegations lack the specificity that the PSLRA requires. *See*, *e.g.*, TAC ¶ 142 ("All of Corinthian's stated financial results during the entire Class Period were false and misleading as a result of the Company-wide scheme to inflate enrollment figures in order to misappropriate federal financial aid funding.").

**[12]** The TAC alleges that virtually every statement made by Corinthian during the Class Period related to the company's financial health or performance was, by definition, false. The TAC mistakes quantity for quality. Although the TAC sets forth a considerable number of alleged false statements, the TAC's explanation of how and why the statements were false is decidedly vague. The TAC alleges that Corinthian's statements regarding its financial status were false because they "create the false impression that defendants ran their business with proper financial reporting compliance with student enrollment and federal loan practices which were critical to the viability of the business, and that quality of education was emphasized." TAC ¶ 150. But this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of fraud generally. *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1086 ("[A]lthough the complaint alleges that over the fifteen-month class period, [defendant] continually and deliberately misled investors by stating that its sales-cycle was 'holding steady at three to six months,' much of the complaint fails to allege any facts to indicate why this statement would have been misleading at the several points at which it was alleged to have been made.") (falsity not established due to lack of particularity; dismissal affirmed); *Ronconi*, 253 F.3d at 429-32 (affirming dismissal due to lack of falsity where plaintiff's allegations based on defendant's general statements regarding strength of its sales); *Silicon Graphics*, 183 F.3d at 984-85 ("[Plaintiff] would have us speculate as to the basis for the allegations about the reports, the severity of the problems, and the knowl-

edge of the officers. We decline to do so."). Here, the TAC fails to sufficiently allege facts that demonstrate the falsity of Corinthian's characterizations of its financial health and business practices during the Class Period.

As to the specific regulatory investigations, Metzler is likewise unable to connect their non-disclosure with any statement by Corinthian's regarding its financial health rendered false or misleading due to the omission. *Ronconi*, 253 F.3d at 432 (plaintiff "must [ ] alleg[e] specific 'contemporaneous statements or conditions' . . . deliberately reckless [ ] or misleading . . . when made."). The general statements the TAC identifies as false or misleading are Corinthian's disclosures of its current revenue projections and anticipated growth. But the TAC's connection between the falsity of these statements and the regulatory investigations is extraordinarily vague. TAC ¶ 147(a) (financial statements false because they "created the overarching impression that the Company was outperforming expectations and continually increasing revenue through legitimate business means") (emphasis omitted). The PSLRA requires a clearer explication of why a statement is false. 15 U.S.C. § 78u-4(b)(1) (must specify "the reason or reasons why the statement is misleading"); *Silicon Graphics*, 183 F.3d at 974 (must plead facts that demonstrate intent).

Second, Corinthian was not required to make an immediate disclosure of the DOE and California AG investigations, at least not on the facts of this case. A comparison to *In re Apollo Group, Inc. Securities Litigation*, 509 F. Supp. 2d 837, 841 (D. Ariz. 2007), is instructive. In *Apollo* the district court denied the parties' cross-motions for summary judgment based in part on a disputed fact regarding the materiality of a DOE investigation of the Apollo Group. *Id.* Like Corinthian, Apollo is a large for-profit provider of post-secondary education. *Id.* at 839. The plaintiffs based their claim on the fact that Apollo failed to reveal a DOE investigation of misconduct that tied recruiters' compensation to enrollment figures. *Id.* Defendants failed to disclose a report containing a prelimi-

nary DOE finding of non-compliance related to those practices. *Id.* ("The report, which was issued on February 5, 2004, concluded, among other things, that the [Apollo campus at issue] improperly compensated its enrollment counselors 'solely based on [the] recruiters' success in securing enrollments,' a violation of DOE regulations.") (second alteration in original). Two weeks after the DOE issued that report, Apollo released a press statement regarding a dismissal in related lawsuits based on allegations of recruiter misconduct and that "the government declined to intervene" in those suits. *Id.* at 841-42. Although this statement was formally true, the court found a disputed issue of fact as to whether it was "misleading" in light of the DOE report concerning the exact same recruiting practices.[14] *Id.* at 842; *see also In re Apollo Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005) (denying motion to dismiss in same case where CEO misleadingly suggested that no report would issue from DOE). Here, unlike the complaint in *Apollo*, the TAC does not connect the DOE or California Attorney General investigations to any false or misleading statement—*i.e.*, some affirmative statement or omission by Corinthian that suggested it was *not* under any regulatory scrutiny.

**[13]** In sum, the TAC's far-ranging collection of alleged false statements simply fail to identify with sufficient specificity how and why the statements were false, and thus fail to comply with the PSLRA.

## D. Dismissal with prejudice was proper.

Denial of leave to amend is reviewed for abuse of discretion. *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1097. As we have observed, "the district court's discretion to deny leave to amend is particularly broad where plaintiff has previously

---

[14]In a settlement agreement that contained no admission of wrongdoing, Apollo agreed to pay $9.8 million to settle the DOE's program review. *In re Apollo Group Inc.*, 509 F. Supp. 2d. at 839-40."

amended the complaint." *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003) (internal quotations and citation omitted). Admittedly, the prior dismissals here did not provide Metzler with guidance as to the basis for the dismissals. But the parties' dismissal briefing below and on appeal confirms that Metzler's prior amendments were intended to cure the deficiencies that lead us to affirm dismissal here—that the TAC failed to properly plead loss causation, scienter, and falsity. Metzler points to no additional facts that it might allege to cure these deficiencies, which persisted in every prior iteration of the TAC. *See Silicon Graphics*, 183 F.3d at 991. We therefore affirm dismissal of the TAC with prejudice.

## IV.    CONCLUSION

The TAC's allegations, although not lacking in breadth or numerosity, ultimately fail to meet the PSLRA's exacting requirements and the standards for pleading loss causation. The disclosures that the TAC relies on simply do not identify the requisite causal connection between Metzler's claims of fraudulent student admission and financial aid practices, and a resulting drop in Corinthian's stock price. Likewise, the sheer volume of alleged false statements and claims supporting scienter do not overcome the lack of specificity that the PSLRA requires. For these reasons, we affirm.

**AFFIRMED.**